

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-22-00768-CV

**IN THE INTEREST OF L.S.R.**, J.A.L., and P.L., Children

From the 225th Judicial District Court, Bexar County, Texas
Trial Court No. 2019-PA-02034
Honorable Antonia Arteaga, Judge Presiding

Opinion by:    Irene Rios, Justice

Sitting:        Patricia O. Alvarez, Justice
                Irene Rios, Justice
                Liza A. Rodriguez, Justice

Delivered and Filed: August 9, 2023

AFFIRMED

Appellant Mother appeals the trial court's order terminating her parental rights to her children, L.S.R., J.A.L., and P.L.[1]  Mother challenges the sufficiency of the evidence supporting the trial court's finding that termination was in the children's best interests.  We affirm.

### BACKGROUND

The Department of Family and Protective Services ("the Department") became involved in the underlying case in 2018, when it received a referral alleging there was illegal drug use in the home.  In January 2019, the case was transferred to Family Based Services where Mother and Father T.L. were set up with services to take random drug tests, complete a substance abuse

---

[1] To protect the identity of minor children in an appeal from an order terminating parental rights, we refer to the parents as "Mother," father of L.S.R. as "Father J.R.," and father of J.A.L. and P.L. as "Father T.L."  We refer to the children as "the children" or using their initials.  *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

program, and engage in individual and couple's counseling. After failed safety placements with Mother and Father T.L., L.S.R. and J.A.L. were placed with L.S.R.'s paternal aunt and uncle in June 2019.[2]

On October 4, 2019, the Department filed a petition seeking temporary managing conservatorship of L.S.R. and J.A.L. and termination of Mother's parental rights to L.S.R. and J.A.L., termination of Father J.R.'s parental rights to L.S.R., and termination of Father T.L.'s parental rights to J.A.L. In January 2020, the Department received a referral stating P.L. was born with amphetamines in her system. On January 10, 2020, the Department filed its first amended petition adding P.L.—who was born while the case was pending—and seeking temporary managing conservatorship of P.L. and termination of Mother's and Father T.L.'s parental rights to P.L.

On October 13, 2020, Aunt and Uncle filed a petition in intervention seeking appointment as permanent managing conservators of the children. On May 24, 2021, Aunt and Uncle amended their petition in intervention seeking termination of the parents' parental rights in addition to their request for permanent managing conservatorship of the children.

Father J.R. entered into a Rule 11 agreement with the Department, the attorney ad litem for the children, and Aunt and Uncle that named Father J.R. as a possessory conservator of L.S.R. Father T.L. entered into a Rule 11 agreement with the Department, the attorney ad litem for the children, and Aunt and Uncle that named Father T.L. as a possessory conservator of J.A.L. and P.L. On September 12, 2022, the trial court signed the Rule 11 agreements and notated they were "Approved and Rendered." On September 20, 2022, the trial court signed an order dismissing the remainder of the Department's suit for failure to commence trial by the automatic dismissal date.

---

[2] We refer to L.S.R.'s paternal aunt and uncle as "Aunt" and "Uncle."

On September 13-14, 2022, the trial court held a bench trial on Aunt's and Uncle's claims for conservatorship and termination of Mother's parental rights to the children. The trial court heard testimony from Latoya Goode, an investigator with Child Protective Services ("CPS"); Angela Orta, a supervisor with Family-Based Services; Patricia Chi Triplett, a former investigator for the Department; Sharman Wilson, the Department's caseworker from December 2019 to June 2021; Shawna Ramsey, the Department's caseworker from May 2021 to July 2022; Patricia Cole, the former director of the children's daycare; Toya Frederick, a worker at the children's daycare; Tedi McVae, Mother's therapist and L.S.R.'s former therapist; Mother; and Aunt.

On October 26, 2022, the trial court signed an order terminating Mother's parental rights to the children. Specifically, the trial court terminated Mother's parental rights based on statutory grounds (D), (E), and (F) in subsection 161.001(b)(1) of the Texas Family Code. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (F). The trial court also found it was in the children's best interests to terminate Mother's parental rights. *See id.* § 161.001(b)(2). Mother appeals.

### STATUTORY REQUIREMENTS AND STANDARD OF REVIEW

To terminate parental rights pursuant to section 161.001 of the Texas Family Code, the Department has the burden to prove by clear and convincing evidence: (1) one of the predicate grounds in subsection 161.001(b)(1); and (2) that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b). Clear and convincing evidence requires "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007.

When reviewing the sufficiency of the evidence, we apply well-established standards of review. *See id.* §§ 101.007, 161.206(a); *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (conducting a factual sufficiency review); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (conducting a legal sufficiency review).

"In reviewing the legal sufficiency of the evidence to support the termination of parental rights, we must 'look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true.'" *In re J.L.B.*, No. 04-17-00364-CV, 2017 WL 4942855, at *2 (Tex. App.—San Antonio Nov. 1, 2017, pet. denied) (mem. op.) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). "[A] reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *J.F.C.*, 96 S.W.3d at 266. "A corollary to this requirement is that a [reviewing] court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.*

"In reviewing the factual sufficiency of the evidence to support the termination of parental rights, we 'must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing.'" *J.L.B.*, 2017 WL 4942855, at *2 (quoting *J.F.C.*, 96 S.W.3d at 266). "A [reviewing court] should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *J.F.C.*, 96 S.W.3d at 266. "The [reviewing] court must hold the evidence to be factually insufficient if, in light of the entire record, the disputed evidence contrary to the judgment is so significant that a reasonable factfinder could not have resolved that disputed evidence in favor of the ultimate finding." *In re M.T.C.*, No. 04-16-00548-CV, 2017 WL 603634, at *2 (Tex. App.—San Antonio Feb. 15, 2017, no pet.) (mem. op.).

Further, in a bench trial, the trial court is the sole judge of the credibility of witnesses and the weight to be given their testimony. *HealthTronics, Inc. v. Lisa Laser USA, Inc.*, 382 S.W.3d 567, 582 (Tex. App.—Austin 2012, no pet.). This is because "the trial judge is best able to observe and assess the witnesses' demeanor and credibility, and to sense the 'forces, powers, and influences' that may not be apparent from merely reading the record on appeal." *Coburn v.*

*Moreland*, 433 S.W.3d 809, 823 (Tex. App.—Austin 2014, no pet.) (quoting *In re A.L.E.*, 279 S.W.3d 424, 427 (Tex. App.—Houston [14th Dist.] 2009, no pet.)). We, therefore, defer to the trial court's judgment regarding credibility determinations. *Coburn*, 433 S.W.3d at 823–24.

## BEST INTEREST

Mother argues the evidence is legally and factually insufficient to support a finding that termination of her parental rights is in the children's best interests.

When considering the best interest of a child, we recognize the existence of a strong presumption that the child's best interest is served by preserving the parent-child relationship. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). However, we also presume that prompt and permanent placement of the child in a safe environment is in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a).

In determining whether a parent is willing and able to provide the child with a safe environment, we consider the factors set forth in section 263.307(b) of the Texas Family Code.[3]

---

[3] These factors include:

(1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child [or] the child's parents . . . ; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills . . . ; and (13) whether an adequate social support system . . . is available to the child.

TEX. FAM. CODE ANN. § 263.307(b).

*See id.* § 263.307(b). We also consider the *Holley* factors.[4] *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are not exhaustive. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). "The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *Id.* In analyzing these factors, we must focus on the best interest of the child, not the best interest of the parent. *Dupree v. Tex. Dep't of Protective & Regul. Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ).

Evidence that proves one or more statutory ground for termination may also constitute evidence illustrating that termination is in the child's best interest. *C.H.*, 89 S.W.3d at 28 (holding same evidence may be probative of both section 161.001(b)(1) grounds and best interest, but such evidence does not relieve the State of its burden to prove best interest). "A best-interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence." *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). "A trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest." *Id.*

*Desires of the Child, Plans for the Child, and Stability of the Home*

"When children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal

---

[4] These factors include: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the child's best interest; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also In re E.C.R.*, 402 S.W.3d 239, 249 n.9 (Tex. 2013).

time with a parent." *In re S.J.R.-Z.*, 537 S.W.3d 677, 693 (Tex. App.—San Antonio 2017, pet. denied).

Here, the children were all less than seven years old at the time of trial. The children have been placed with Aunt and Uncle since June 7, 2019. L.S.R. was three years old and J.A.L. was less than a year old when they came into Aunt's and Uncle's care. P.L. was removed from Mother when she was five days old and has remained in Aunt and Uncle's care her entire life.

Patricia Cole, a former director at the children's daycare, testified the children loved Aunt, stating: "You could tell that there was a lot of love for her when [the children] would see her. . . . As soon as they would see her, they would yell . . . and they would run to her." Cole opined that the children's bond with Aunt "was very motherly." Cole stated when Aunt and Uncle dropped off the children, "[t]hey were very well dressed[,]" "very well taken care of[,]" and they were properly attired for the weather. In contrast, Cole stated J.A.L. would always have a dirty diaper and dirty face when the children were dropped off by Mother.

Sharman Wilson, the Department's first caseworker on the case, testified that while Mother is bonded with L.S.R., she is not bonded with the two younger children. Further, Mother only attended half of the visitations available to her during the three-year period since the children were removed. Sharman testified the children were very well cared for by, and bonded with, Aunt and Uncle.

Shawna Ramsey, the Department's second caseworker on the case, also stated the children appeared very bonded with Aunt and Uncle and enjoyed playing together when they were with Aunt and Uncle. Ramsey did not have any concerns with the care provided by Aunt and Uncle. In contrast, Ramsey testified that L.S.R. would sometimes say she didn't want to go to a visitation with Mother because "she was scared of mommy." *See* TEX. FAM. CODE ANN. § 263.307(b)(5) (listing "whether the child is fearful of living in or returning to the child's home" as a factor the

trial court considers when determining a child's best interest). While Ramsey testified that L.S.R. is bonded to Mother, she opined that J.A.L. and P.L. are not bonded with Mother, and it "would be beneficial to [L.S.R.] to cut off the bond" she has with Mother.

Aunt stated she and Uncle love the children, they have provided the children with "a safe, happy, [and] stable home environment[]" for the last three years, and all they want for the children "is for them to be safe, happy, normal kids and in a safe environment." The trial court heard testimony that J.A.L. and P.L. call Aunt "mama" and L.S.R. calls her "[m]ama [t]iti."

The trial court could have concluded, based on this testimony, that the children have bonded with Aunt and Uncle, are well cared for by them, are in a safe and stable environment under their care, and have spent minimal time with Mother. Based on these factors, the trial court could have reasonably formed a firm belief or conviction that termination of Mother's parental rights was in the children's best interests.

*Frequency and Nature of Out-of-Home Placement*

The trial court heard evidence that the Department intervened four different times before the Department sought removal of the children. Mother's testimony indicates the children were removed more than once during the pendency of the case. *See* TEX. FAM. CODE ANN. § 263.307(b)(2) (providing a trial court considers the frequency and nature of out-of-home placements when determining a child's best interest); *see also In re G.C.D.*, No. 04-14-00769-CV, 2015 WL 1938435, at *8, 10 (Tex. App.—San Antonio Apr. 29, 2015, no pet.) (mem. op.) (considering the Department's past involvement in its best-interest analysis).

Mother testified the Department first became involved in December 2018 when it received a referral that she was engaging in illegal substance abuse and Mother tested positive for illegal substances. The Department received a second referral in April 2019 when L.S.R. was injured by a rocking chair that fell over while Mother and Father T.L. were arguing. The Department received

a third referral in June 2019 when L.S.R. was struck with a plate while in Mother's care. The Department received the fourth referral in September 2019 when Father T.L. experienced a drug overdose.[5] According to Mother, Father T.L.'s drug overdose led to the initiation of the legal case.

Based on this factor, the trial court could have reasonably formed a firm belief or conviction that termination of Mother's rights was in the children's best interests.

*Parental Abilities, Emotional and Physical Needs*

"The need for permanence is the paramount consideration for the child's present and future physical and emotional needs." *Dupree*, 907 S.W.2d at 87. "This court considers a parent's conduct before and after the Department's removal of the child[]." *S.J.R.-Z.*, 537 S.W.3d at 693. A child's young age renders him vulnerable if left in the custody of a parent who is unable or unwilling to protect him or attend to his needs. *Id.* "A parent's inability to provide adequate care for a child, lack of parenting skills, and poor judgment may be considered when examining children's best interests." *In re K.A.D.K.*, No. 04-15-00758-CV, 2016 WL 1587535, at *6 (Tex. App.—San Antonio Apr. 20, 2016, pet. denied) (mem. op.).

Wilson testified J.A.L. was not current on his vaccinations when he came into the Department's care. Goode—a CPS investigator—testified that Mother's home was "in a chaotic state" and "was just in shambles." On the day L.S.R. was removed from Mother's home, Aunt stated she had blood on her, did not have any shoes, and was only wearing a shirt and underwear when Aunt picked her up.

---

[5] According to Mother's testimony, the children were either returned to Mother's home or in the process of being returned to Mother's home when the Department received the fourth referral in September 2019. Mother's testimony is unclear on whether the children were returned to Mother after they were placed with Aunt and Uncle in June 2019. Mother's testimony also indicates Mother and Father T.L. were in a relationship and living together at the time Father T.L. overdosed.

As mentioned above, Cole testified that J.A.L. tended to be unkempt when he was dropped off at daycare by Mother. Cole also stated that Mother did not bring the children supplies often and would have to be reminded to provide the children with supplies. In contrast, Cole stated the children arrived at daycare with all the supplies they needed when Aunt dropped them off.

According to Cole, Mother would sometimes "lose her cool" when the daycare asked her to bring supplies for the children. Cole further testified that Mother made three inappropriate calls threatening employees of the daycare if they did not do what she asked. Wilson mentioned other concerning interactions with Mother when Mother had visits with the children. According to Wilson, Mother would act belligerent with Aunt and Uncle and project her voice loudly. Aunt also described an incident where Mother was honking a car horn and playing music loudly outside Aunt's home and the incident caused L.S.R. to cry.

Ramsey testified Mother would often have issues in the CPS lobby as well. Ramsey stated:

> There were multiple times that [Mother] would yell at [Ramsey when] children and other families [were] in close proximity. She would say inappropriate things. One time she protested and [laid] out in front of the outside of the door at CPS so that people could not come in or out of the door[, and she] had to be asked to leave by the police.

Ramsey testified Mother asked for all the things she had purchased for the children to be returned to her in November 2021. When asked why she wanted these items returned to her, Mother told Ramsey:

> [S]he had bought [the items]. That it was her children, and that she could do whatever she wanted with their possessions. And that she wanted [the items] to be at her home and not [at Aunt and Uncle's] home.

Ramsey further described incidents in the winter of 2021 where Mother became visibly upset towards the end of a visit and refused to let the children leave the visit with their shoes or a jacket. According to Ramsey, Mother reasoned that "because it was her children's clothes, she could do whatever she wanted." Aunt corroborated at least one incident, stating after a winter visit

with Mother, the children left wearing only pajamas with no shoes or jacket. Mother countered that she only took the shoes away because they didn't fit and claims to have bought the children "a wagon full of clothes and shoes." However, Aunt disputed Mother's testimony when she stated she never sent the children with shoes or clothes that were too small and Mother provided clothing for the children "only in the beginning" of the case. *See HealthTronics, Inc.*, 382 S.W.3d at 582 (holding, in a bench trial, the trial court is the sole judge of the credibility of witnesses and the weight to be given their testimony).

During a visitation, Mother told L.S.R. that Aunt was mad at Mother and was therefore trying to keep the children from her. When Ramsey told Mother it was inappropriate to discuss the case with L.S.R., Mother responded: "She could tell her children whatever she wanted to." Ramsey testified Mother's tone was angry and her voice was raised. During this altercation, the children became upset and began crying, and Ramsey had to end the visit early. Accordingly, Ramsey opined Mother has not been "able to demonstrate appropriate parenting skills or a safe and stable environment for the children to be returned to," and Mother is unable to meet the physical and emotional needs of her children.

While Tedi McVae, mother's therapist, testified that Mother has exhibited improvement on being a caregiver and is currently demonstrating stability, she conceded that Mother's longest period of stability was approximately three months and Mother experienced instability as recently as three months before trial. The periods of instability include unstable housing and an unstable environment due to "the peers [Mother] allowed in her environment." McVae also conceded her assessment of Mother's current stability is based only on Mother's self-reporting. Mother testified she currently has three jobs, including her own bookkeeping business. However, Ramsey was never able to verify Mother's employment. *See HealthTronics, Inc.*, 382 S.W.3d at 582.

Ramsey expressed concern that Mother paid more attention to L.S.R. than J.A.L. and P.L., and the children did not behave well during visits with Mother. Aunt echoed those concerns stating Mother would primarily focus on L.S.R. and would neglect the younger two children.

Finally, Aunt stated L.S.R. has access to her paternal extended family, and she currently does and will continue to facilitate visitation between J.A.L. and P.L. and their paternal extended family if Aunt and Uncle were granted managing conservatorship of the children. *See In re J.F.*, No. 06-15-00033-CV, 2015 WL 7293322, at *9 (Tex. App.—Texarkana Nov. 19, 2015, no pet.) (mem. op.) (stating a caregiver's willingness to facilitate the children's relationships with their extended family provided for the children's emotional needs and reflected positively on the caregiver's parental abilities).

Based on these factors, the trial court could have reasonably formed a firm belief or conviction that termination of Mother's parental rights was in the children's best interests.

*Emotional and Physical Dangers and History of Substance Abuse*

"As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied) (citing *S.D.*, 980 S.W.2d at 763). "Continued illegal drug use [by the parent] . . . is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct, and that termination is in the best interest of the child." *See In re D.M.M.*, No. 14-16-00664-CV, 2017 WL 61847, at *5 (Tex. App.—Houston [14th Dist.] Jan. 5, 2017, pet. denied) (mem. op.); *see also* TEX. FAM. CODE ANN. § 263.307(b)(8) (stating one of the factors to consider in a best interest determination is "whether there is a history of substance abuse by the child's family or others who have access to the child's home"). "This court considers a parent's conduct before and after the Department's removal of the children." *S.J.R.-Z.*, 537 S.W.3d at 693.

One of the concerns that brought the children into the Department's care was an allegation that Mother was using illegal drugs. Goode testified Mother initially denied illegal drug use, but when confronted with concerning drug test results, Mother admitted to using methamphetamines. Triplett, a former investigator for the Department, testified that P.L.—who was born during the pendency of the case—was born with amphetamines in her system. In response, Mother claimed she had a prescription for Adderall that triggered the positive test for amphetamines in her system.

Mother completed an outpatient drug treatment program, but the Department remained concerned because Mother continued to test positive for drugs. Wilson testified that Mother admitted to using drugs and signed a form acknowledging her drug use. Wilson stated the Department's goals for the children shifted from reunification to termination of Mother's parental rights due to Mother's continued substance abuse. The trial court heard testimony that, at one point prior to P.L.'s birth, Mother had an opportunity to have more favorable visitation with the older two children if she would submit to and provide a negative nail bed drug test ordered by the trial court. However, Mother never took the court-ordered drug test.[6] Although Mother did not take the court-ordered nail bed drug test and did not have concerning results on her urinary analysis drug tests, Ramsey testified Mother tested positive every time she took a hair follicle drug test. Mother took hair follicle drug tests every three months while Ramsey was the caseworker.

When Ramsey confronted Mother regarding her positive drug tests, "[Mother] would state things like it must have been my [hair] extensions or a vape a friend let me borrow." Mother also told Ramsey she was drugged and raped, and that [is] why those tests were positive. *See*

---

[6] Mother testified she took a private nail bed test that was not referred by the Department. However, the Department would only accept results of a test that was referred by the Department. Mother testified she could not take a second nail bed test that was referred by the Department because there was not enough of her nail left after the first test. *See Coburn*, 433 S.W.3d at 823–24 (holding a reviewing court defers to the trial court's judgment regarding credibility determinations).

*HealthTronics, Inc.*, 382 S.W.3d at 582 (holding, in a bench trial, the trial court is the sole judge of the credibility of witnesses and the weight to be given their testimony).

Aunt testified Mother told her she has been on and off drugs since she was seventeen years old. Although Mother claims she is currently sober, she also testified she has participated in several different drug treatment programs and admitted she has continued to relapse after completion of the programs. While McVae testified she believed Mother has exhibited some improvement towards her substance abuse goals, she also conceded that Mother relapsed several times during the pendency of the case, and this poses a danger to the children. Accordingly, the trial court heard ample evidence indicating Mother had not overcome her drug addiction.

"Criminal conduct, prior convictions, and incarceration affect[] a parent's life and [her] ability to parent, thereby subjecting [her] child to potential emotional and physical danger." *See In re J.J.O.*, No. 04-18-00425-CV, 2018 WL 5621881, at *2 (Tex. App.—San Antonio Oct. 31, 2018, no pet.) (mem. op.). Here, Mother testified her criminal history included harboring a fugitive—a charge Mother indicated is still pending—failure to appear for court, and obstruction of a highway.

As mentioned above, the trial court heard testimony that L.S.R. was repeatedly injured while in Mother's care. The trial court also heard testimony that the children, particularly J.A.L. and P.L., were neglected while in Mother's care and during visitations.

McVae testified it would be harmful to the children to terminate Mother's parental rights; however, the trial court could have weighed the evidence and concluded Mother's substance abuse, her history of criminal activity, and the repeated physical harm to L.S.R. and neglect of J.A.L. and P.L. posed a greater harm to the children.

Based on these factors, the trial court could have reasonably formed a firm belief or conviction that termination of Mother's parental rights was in the children's best interests.

*Programs, Acts or Omissions, Excuses for Acts or Omissions, Willingness to Effect Positive Change*

Mother's service plan required her to participate in and complete individual counseling, couples counseling, parenting classes, a psychological evaluation, take a drug assessment and follow any treatment recommendations, and pass random drug tests. Mother was also required to provide proof of stable income and housing.

Ramsey testified the service plan was tailored to address the reasons for removal and made an order of the trial court. Ramsey stated she went over Mother's service plan with her.

Mother completed her parenting classes and psychological evaluation and continued to engage in individual counseling. Mother completed more than one drug treatment program but continued to test positive for drugs throughout the pendency of the case. As mentioned above, Mother only participated in half of the visitations with the children. Wilson testified Mother's visitation was sporadic; however, Mother explained she was working or sick for at least some of the missed visitations. As mentioned above, Mother did not provide proof of stable income and her ability to provide a safe and stable home was questionable.

The trial court heard testimony Mother was unable to remain sober and did not successfully complete all her services. The trial court could have concluded this indicates Mother was unwilling to effect positive environmental and personal changes for her children. *See* TEX. FAM. CODE ANN. § 263.307(b)(11) (providing the court considers "the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time" when determining the child's best interest); *see also Holley*, 544 S.W.2d at 371–72 (holding the court considers "the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one" when determining a child's best interest).

Having reviewed the record and considered all the evidence in the appropriate light for each standard of review, we conclude the trial court could have formed a firm belief or conviction that termination of Mother's parental rights is in the children's best interests. *See* TEX. FAM. CODE ANN. § 161.001(b)(2); *H.R.M.*, 209 S.W.3d at 108; *J.P.B.*, 180 S.W.3d at 573; *see also generally In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (recognizing an appellate court need not detail the evidence if affirming a termination judgment). Accordingly, we hold the evidence is legally and factually sufficient to support the trial court's best-interest findings.

## CONCLUSION

We affirm the trial court's order terminating Mother's parental rights to her children.

Irene Rios, Justice